The question is whether, under the law, a reasonable, objective person would question the court's impartiality. I'd note both of those cases were tried and completed prior to these events. The only events that occurred in these two cases after the purported basis for recusal were the sentencings. And there in no way would a reasonable person look at what Judge Schwab did in those cases and find that he was unfair in any way to Mr. Clemons or Mr. Cunningham. Well, we'll be getting in, I guess, to the merits later, but sticking to your point about 455A, why don't you respond, if you would, to Ms. Freeland's assertion that under the techie, is that how you say it, too? I'm going to say it that way. That under that case, this does constitute an extrajudicial source because it was clear that this wasn't about the mandamus. Attorney McGuff said so repeatedly, and the explanations of the district court notwithstanding, the record makes it clear that this was a strike at the Office of the Federal Public Defender for the temerity of bringing a lawyer into court and sort of upping the ante in the dispute with the district court. Well, there's no reason to disbelieve the district court's expressed statements that it was concerned that there was going to be a potential mandamus, and it was concerned, in light of the fact that mandamuses can become hostile, that there was a concern about it. But I would also note, even though the judge said he was going to recuse on Reed Smith cases, he ultimately reconsidered himself. He came back on the bench on the afternoon of July 15th and said, I reconsidered myself, I'm not going to recuse. That's the challenge with these cases, right? Because the underlying premise of the Federal Public Defender is those words, once they're out, they're out. You don't get to put that genie back in the bottle and say, I changed my mind. Once you say, I don't think I can be fair to you people, you've betrayed that you can't be fair to us. And so now saying, I think I can be fair to you people, isn't any good, because you've already turned your cards over, they're up on the table. I'm mixing my metaphors here, genies, cards, whatever you want to say. He's a very magical genie. You can't unring the bell. You know, whatever you want to say, it's out there, and it doesn't magically disappear if you come in the next day and say, I changed my mind. I mean, I think you have to remember the context of what we have here. What we have here is, during a suppression hearing, defense counsel bringing a private counsel to sit at counsel table without an entry of an appearance, and the court initially reacting to it. Letecki notes that judges are human. Yes. Yes. You're missing the legal point I'm getting you to try to speak to. Their position as a legal matter, I think, is the words you spoke are out there. They don't evaporate because you say, I changed my mind. The betrayal of bias or the appearance of bias is there. What's your response to that? Does 455A allow you to make a change in position the way he did? The words are out there in the context of a judicial proceeding, and in Letecki, the Supreme Court expressly noted that. The judges are going to make mistakes. Judges are going to say things they don't mean, but unless there's a personal or extrajudicial bias, generally, recusal isn't warranted under 455A. The assertion that it's parties and not lawyers that count in the Letecki sense, that the parties are not the same here, and so there is no precedent that would lead us to apply Letecki in a context like this. And that is a point that we made in our briefs, that certainly the purpose of recusal, which is what we're here to do. This is not a mandamus about the Office of the Federal Public Defender and the judge. We're here today with regard to two criminal cases and the question of whether recusal was warranted in these particular cases. And the issue under 455A is whether the judicial proceedings were fair to the parties. I cited a case from the Fifth Circuit, United States v. Davis, and in that case, the court noted that there are going to be issues between counsels and judges. That's going to happen, but the question is the fairness to the parties. And in this case, there's no indication that this judge was biased in any way. So there's no issue at all of fairness to counsel? Well, certainly. There can be circumstances, and the Selfridge case is a perfect example, where there's such a hostile relationship between one judge and one attorney that you can impute a problem in the litigation. But what we have here also is an institutional party, the FPD, moving to recuse in every case. I'd note that Vu and Hall involved one particular Assistant Federal Public Defender. There are numerous Assistant Federal Public Defenders that appear before this judge. And so the question in this case should be whether or not recusal was warranted because it affected Mr. Clemens or Mr. Cunningham. Are you here to speak about the request for a blanket recusal? Yes. Or are you just saying in these two cases, he should not be recused? That was going to be my second point, which is that there's no statutory or legal authority for this unprecedented request for the permanent disqualification of a district judge. Now, in the appellant's briefs in these cases, they cite 28 U.S.C. 2106. But that statute specifically talks about this court's ability to remand a cause, remand one particular proceeding and handle that matter. Basically, this is almost like an advisory opinion that this judge can never be fair in cases that haven't ever been filed. And I could not find any statutory or legal authority that would support this court, give this court jurisdiction to enter such an order. What about general supervisory authority over the proceedings in the trial courts under our supervision? But these cases haven't even been filed yet. And there's no indication to enter that type of order without... You say these cases haven't been filed yet. You mean the future cases haven't been filed yet? The future cases have not even been filed yet. That wouldn't go to my question, though, because if, and I'm not saying this is the case, but if the situation was such that there was such tension between a judge and a legal office that it would be appropriate to remove that office's cases from that judge, why wouldn't the supervisory authority of this court, of this appellate court, allow us to do that, even if the cases that hadn't been filed, because the fact that they haven't been filed doesn't change the fact that there's animosity there which may well continue into the future. I understand, Your Honor, but this is not a mandamus action. This is an appeal in these two individual cases. The issue is the remedy. If there is to be a remedy, I'm not suggesting there is yet, but if there is to be a remedy, you're saying we have no legal authority to grant the kind of remedy that they're asking for, and I'm asking you why wouldn't that be inherent to our supervisory authority? Again, because I've not found any case in which a court has removed a judge from hearing cases with regard to an institutional client. Have you seen any case like this? Forget the remedy. Any case like this at all? I have not. I have not. I don't see any more from two. Well, you were not about to catch off because your light is on, and you stopped talking. We certainly let this feeling go on forever. If you want to say some more to us, don't. But I also want to get back to the point of the basis for this recusal, simply the comments to Mr. McGaugh to ask for that type of remedy that you were just discussing and talking about based on a comment to a civil attorney in the course of one particular proceeding when there clearly was upset from the judge about the handling and administration of two cases would just be unprecedented and not warranted. Well, but the judge's comment is unprecedented. I don't remember a situation where the judge says to a private attorney who an office in the exercise of its good judgment brings in to advise it in ethical matters in an ongoing criminal proceeding when the judge says, wait a minute, if you're going to be in this case, you need to know and you need to go back and talk to your partners about this because it just may be that I can't hear any cases from your firm, again, from your firm, not from you, Mr. McGaugh, but from your firm. I don't get it. Well, this judge was a former partner of this firm. I know, but he wasn't recusing himself on that basis. That might be the basis to recuse himself, but that clearly wasn't the way he was recusing himself. That's correct, Your Honor. He indicated, and there's, again, no reason not to take him at his word. He believed that there would be a potential mandamus being filed, and I have to address another point. Even if Mr. McGaugh was not counsel of record on that mandamus, he had been hired to provide counsel with regard to the conflict, and the mandamus, which everyone understood would be filed, dealt with that issue of conflict. So to say that Mr. McGaugh, to say that there would be, he has nothing to do with that, that just doesn't seem reasonable. Well, he has something to do with it. Let's assume he clearly has something to do with it. If he is in the suit because he has something to do with it, or if his firm is in the suit because they have something to do with it, why in the old wit and the attorneys who are bringing the action be not in the suit but underneath the kettle? Well, Your Honor, again, my point with regard to that is that none of this actually occurred. None of this actually happened. There was no mandamus. There was no recusal on Reed Smith cases. The next thing that happened was 21 motions for disqualification being filed with the district court. He actually seemed, in reading some of the comments that he made, he seemed like he was actually angry at the Office of the Federal Defender. And when he was making the comments to Mr. McGaugh regarding the recusal in Reed Smith cases, he was saying, by the way, you may have to go back, Reed Smith, tell all of your clients that you may not be able to appear before me. It seemed like he was really, had an animus towards the Office of the Public Defender, the Federal Defender at that point. And in the opinion that he wrote, that 81-page opinion, and Ms. Freeland is correct, he did make that statement. I'm not sure if it's inaccurate, but there's a tone in his writing that suggests that he is not very happy with this office. The statement that he made was, the Office of the Federal Defender embarked on an extraordinary, probably unprecedented campaign to disqualify this judge from presiding over any cases that appeared before him with that office. It doesn't, it sounds like it's not going to work out very well in the near term. So maybe she's right. Maybe there has to be a recusal or disqualification, maybe on a temporary basis. I don't know. Your Honor, I would completely disagree with that. Maybe in these cases. No, Your Honor. Again, I could move to the point of harmless air with regard to both of these cases. First, I could talk about Mr. Clemens, who, as the courts noted, he's scheduled to be released in April of 2012 in a few months. So, again, the only thing. Yeah, but Ms. Freeland's 20HA letter yesterday points out entirely accurately that that doesn't move that man's case. He's got the opportunity to make a pitch if he's held longer than he should have been because of an error in sentencing for getting credit against his supervised release. He's got the real and immediate problem of having been tagged with a felony a level higher than he should have been, which has impact on future supervised release violations that may occur. He's got a, it's clear that that's not moved. So he's getting out doesn't get you anywhere, does it? Well, I do want to correct one assertion made in the 20HA, which is that he was given a supervised release term in excess of the statutory maximum. That is not true. This court stated in U.S. v. Sanchez-Gonzalez, a 2002 case, that when you're talking about supervised release in a drug case, which this was, 841B1C trumps the supervised release general statute. So that statute says he could get three years. Accepting that's true. She's right, isn't she? He's got real and immediate consequences, whether he gets out tomorrow or not. But the question in harmless error review that the Supreme Court noted in the recusal context in the Liljeburg case, is the three-part test that this court has to consider in terms of whether recusal motion, whether the error was harmless. And the first aspect of that is whether there would be harm to a defendant. And we're talking about to send this case back for resentencing in a case where he got a sentence within the guideline range already, that he's already served, that's just one factor. The second factor is, this court is sitting here today to review independently all of the issues raised in Mr. Clement's case, as well as Mr. Cunningham's case. So you are going to be sitting in independent review on all of these issues. To the extent that they're sent back, they'll be sent back based on this court's review of the facts and the law. You bear the burden, do you not, of showing that it is clear, clear, that the error, if it was error for him to keep the case, did not affect the district court's selection of the sentence? How do you show that it's clear that . . . Now again, the premise of this is that it was error for him to keep the case because he should have been recused. And I'm taking that for purposes of this discussion only. But if that's the case, how do you show it's clear that that error didn't affect the sentence that either of these gentlemen . . . Well, I don't think that's the standard, Your Honor. In Liljeburg, the court talked about a consideration of a balancing of three different factors, which is the interest of the parties, the interest in the public, and the consideration and balancing of all of those. When you consider what actually happened in Clements and Cunningham, they pointed to no comments or no statements in these two particular cases that would indicate in any way that this judge was biased against these defendants. So your position is that the harmless error standard we ordinarily apply doesn't apply? That's correct. Liljeburg sets forth a three-part test that's different than the traditional harmless error analysis and particular cases. The interest of the public. I mean, that's a big one here where the allegation is that there's an institutional breakdown and a judge cannot be . . . at least the breakdown is to the point where the appearance is that the judge can't be fair to someone who is charged under the Statutes of the United States of representing indigent defendants. That is a huge interest of the public. So we're talking about those three points, but not three equal considerations, because two of them are the same. But those are allegations, Your Honor. Those are only allegations. I understand that. That was the question. I understand they're allegations. I don't know if this is the appropriate time to switch to the substantive issues in Mr. Clements' case. Well, probably not, because I think they want to make their appellant argument on the substantive issues with a different counsel first, and then we'll probably have to hear from . . . I'm going to say the counsel here in other cases, first of all, thank you very much for indulging us and for being so patient. You either are fascinated by the law or you're a group of masochists. I don't know which it is. But we've got still to do the merits issue in these two cases, which assuming we stick to the clock is probably going to run at least half an hour. If anybody wants to . . . I don't know if you can get a quick bite. Where is the snack bar here? I guess it's over in the Federal Building. If anybody wants to run out and grab something and then come back in, I guess, 45 minutes, if we call your case in 45 minutes and you're not here, we're not going to send the gendarmes after you. If you want to stick around, you're certainly welcome to, but if you think that you might more productively spend your time than watching us waltz around with Alice through the Babbit Hall, I'll leave that up to you. Go ahead. Are there any further questions on the recusal matter? No. Thank you. Are you having me back? I sure hope not. Is there anything that is so pressing, so urgent, that you think in our examination of this case we haven't considered, haven't read, haven't thought of, that you need to take those five minutes and argue it? Is there anything that rises to that level?  Two and a half minutes? Is there anything that is so important, so pressing, that you think we haven't read, that you need to take two and a half minutes to argue it? Without sounding like an egotist, I think there are a couple of points made by the government that I could address very briefly and you'd be on your way. Well, we won't be on our way. But why don't you just take literally 60 seconds and this time put the clock on and have the duck come down like on Groucho Marx when she runs over. As long as the firing squad doesn't come down. Well, I can't do that. I'm dating myself when I talk about Groucho Marx and the duck. In one word, selkridge. Selkridge involved a letter written by counsel that upset the judge. We know what the case is about. You know that case. The upset of the district court judge was memorialized in an opinion which could have been deemed an extrajudicial source, but this court did not do that. The other point that I want to make, and I will be sending you the citations in a 28-J letter that we talked about before, is that on harmless error, and this is in the briefs, Ms. Haywood did conflate the harmless error standard for the FSA issue as opposed to the recusal issue, and Judge Jordan is correct that they bear the burden clearly under showing harmlessness of the FSA error, the sentencing error, but Ms. Haywood is correct about the harmless error standard vis-a-vis recusal. The one thing that I would take issue with is that in all of the cases that this court has decided where it's applied Lyle Berg's harmless error standard, and you know I have argued that it should not be applied, the independent review of this court was able to reduce the risk of injustice both to the parties and to the public because it was reviewing the very same issues that the district court confronted under the same standard of review and was able to approach them as if it was the district court judge. In both cases, it was a motion for summary judgment. Here, on none of the issues post-recusal, does this court under the governing standards of review have the ability to independently review in the same way that that kind of review was undertaken in Selkridge and in Ray School Asbestos. Thank you. Probably more like two and a half minutes than 60 seconds, but thank you. If we can move on to the merits in both cases now, and I guess that is Ms. Brunson. And I'm sorry, Your Honor, if there's a misunderstanding. And my reading of the order was, Ms. Brunson's only going to be addressing the substantive issues in the Cunningham case. Oh, you were doing substantive in Clemens? In the Cunningham case, and I think that's what's in the order. Did the court have any questions about the Clemens suppression issue? I did, yeah. Then I will address them. I don't have any questions, Ms. Brunson. No, I do, Ms. Brunson. Just two words. Yeah, what are they? Inevitable discovery. How in the world can you get around inevitable discovery? Let's assume you're dead right on the, whatever you want to call it, strip search, anal search, whatever it is, assuming the record supports it, and that's a big assumption. I didn't go back and check the notes of testimony from the suppression hearing. But it might even rise to the level of just judicial notice. How can you get around inevitable discovery? They were going to find these drugs on the guy once they arrested him. It's a valid arrest. They've got a warrant. He's going to jail. He's going to jail. And my only answer is, absent the level of intrusion of this search, that the drugs may have been recovered at some point after the processing process, in which case they would not have been discovered. They might have been discovered by someone, but certainly not by a federal agent linking them to Mr. Clemens. Well, how would they not be linked to him? They're in about the most intimate place on the guy's body they could possibly be. I mean, whoever takes care of the intake at the jail is going to find those drugs, and they are as linked as you can get to this guy's body. And how do you get around that? And I don't know what specifically procedures at the jail would have led to the search that would have inevitably discovered them. With the police officer looking as he's showered, as he's inspected, there's no way that they cannot find those drugs. I mean, if the processing was really such that it would have had to be discovered absent any intrusion upon, you know, unconstitutional intrusion upon Mr. Clemens' person, then I would not be able to defeat an argument of inevitable discovery. Well, they had information that, in fact, he had secreted drugs in the same place on prior occasions. In his pants, yes. Right. And so they knew that that's where they should look to see if... Well, our complaint in this case is about an anal cavity search and not just searching in somebody's pants for drugs that had... The information they had is that it had been held in his underpants, I think. Well, correct me if I'm wrong about the facts, but my understanding of the facts are he is asked, he's taken into a separate room, door's shut, two officers are with him, he's told to strip, he's told bend over so we can take a look. He's not touched. Then the officer looks around the front and sees the drugs secured where they're secured at the front of the guy's body and sees them immediately. Taped to his Johnson. Yeah. Sees them immediately. Kind of where they don't need to be. Sorry, it doesn't get any better. This case just gets better and better. It really does. So having seen them immediately upon walking around the front, what does, even if we accept for purposes of discussion that what went before that constitutes a cavity search, even taking that as a given, isn't it just irrelevant? They saw nothing there, and the fact that they looked there doesn't mean that it wasn't plainly in sight when they walked around to the front of him. So even inevitable discovery aside for a moment, isn't it just the product of a strip search, not a cavity search? When they walk around and they look at the front, that's where it is. And our argument would be that the basis for the strip search was also wanting, but I understand your question is if the strip search was justified and the only problem might have been a cavity search and no drugs were recovered at that point, where's the problem? Right. And the problem is with the original intrusion. But they wouldn't clearly have any intake. They're going to be strip searched. Excuse me? Clearly with any intake, with any institution where one is incarcerated that I am familiar with, you're going to get strip searched. And then the problem here is that the strip search was not part of the institutional processing. It was by the agents in an investigative manner, and that's the only distinction that I could draw for you there. Reasonable suspicion doesn't get them there? Well, I don't believe that the facts that were known to the officer at the time. A known and previously reliable CI gives them advice. They find two cell phones, $800 plus in small bills on this person, but no drugs. So they're told you're going to find it in the guy's underwear. The search that shows and indicates in their experience that he's been dealing shows that it's not someplace other than in his underwear, and that's not reasonable suspicion for somebody to think it's probably in his underwear. Well, Your Honor, even an officer that is armed with reasonable suspicion under the Fourth Amendment is obliged to pursue the least intrusive means necessary to effect the search. And if the information was, as you suggest, fresh and reliable and good, and that information was that he strips it. And that was the information. I mean, you're not contesting that that's. No, I'm not contesting that that's. But if it was that reliable, then, and the CI said that the drugs had been in the front of the pants, there are less intrusive means, a pat-down to begin to determine if something is there before you strip somebody down. But they did a pat-down. Initially, they did a pat-down just for weapons. Then he's arrested. And that's when the, whatever it is, body cavity search, strip search happens. But I'm not even sure. I would concede that the evidence is stale. It's from two or three years before that. No, no, no. And I don't mean to concede, but I'm accepting what Judge Jordan said, is that the representation was that the CI was credible, had good information upon which this officer based his decision to make the search. My point is that I believe there was a less intrusive, something less than a strip search based on the information that they had, if it was in fact sound. Under the Fourth Amendment, you're not in less intrusive territory. If they have a right to do it, they don't necessarily have the obligation to do it in a way that is less intrusive. They just have a right to do a strip search at that point. You could argue that the institutional purposes and the security purposes would be satisfied by a body scanner or something less intrusive than a strip search. But the Fourth Amendment doesn't require that. Well, I do take some issue with that because I think that under the Fourth Amendment, because the search, I mean, I understand your point because the search and the scope of the search is limited by the information available to the officer at the time so that it can't go beyond that. But it doesn't precisely speak to, and I believe that the principles that flow from the Fourth Amendment fairly stand for the idea that if there is a less intrusive means to affect your search without broadening the scope to infringe upon a person... What type of search are you suggesting as a less intrusive search? Well, what I was saying is that in this instance where the information that the officer was relying on from the CI was that Mr. Clemens had put drugs into his pants, that before stripping him down to search his naked body, the officers had a less intrusive means of discovering if there was something secreted in that area. By a pat-down search? Excuse me? By a pat-down search? Yes. At least in the first instance. It seems like what they did was a whole lot more efficient, wasn't it? And a whole lot more intrusive. Probably less intrusive. A whole lot more intrusive. Less intrusive. Yeah, we're going to do a pat-down. I'm not sure if it's going to be taped there. You might be better off having a visual inspection. I understand the court's feeling, but I think in the world of the Fourth Amendment, a pat-down search is still less intrusive to the person than a strip search is. Well, the Terry pat-down is, but in Terry they weren't envisioning this kind of pat-down. They weren't looking for this. This is a groping. I agree. All right, okay. Thank you. Thank you. I'm sorry. I do have an important question for you. Just one more for you. You're like a bad penny.  I'm moving in. I want you to speak, if you would, just for a moment, to the assertion that the FSA sentence would be the same. It should be taken as a given that the judge was trying to say, I'd give this sentence anyway. What's wrong with that argument? Well, I mean, we don't know, because what the judge actually said isn't as clear as it should be to satisfy the government's burden on harmless error, and that's the argument that we've made. But nine months of incarceration, with the judge knowing that this change applied to him, I don't think the words on the record could fairly be interpreted as what we see many judges, and I'm sure you've seen it here, the judges will say, you know, I've considered the 3553A factors, and no matter what, this is the appropriate sentence. The judge in this case kind of garbled his words and came out sounding like he believed that the 60-month statutory minimum applied either way. And that's the problem with the record. But more than that, and this is how the issues are related, the recusal and the FSA issue, is that if this court ultimately finds that recusal was warranted, certainly that ambiguity would require reversal, because I don't think that in a situation where you have recusal being warranted, this court, without the ability to impose a sentence anew under 3553A, that is, stand in the position of the district court, that to rely on an ambiguous statement made by the very court that should have recused itself, and this is its only point of appeal decision, is problematic. You think the statement was a product of some impropriety or some bias? Do I believe that it was indicative of bias? Yeah, I mean, you want us to vacate the sentence because you believe that he should have recused himself. Well, I want you to vacate the sentence because it was in error, and the government concedes that it was in error, and their only argument here is that nine months additional incarceration is harmless. I don't think we can say that. What was the error? Your argument is, well, I'm sorry, answer Judge Lincoln. Okay, I'm sorry, what was your question? Now, what was the error? His not recognizing the fair sentencing act? Yes. Yeah, but he did. He did subsequently, did he not? No. The error in this case was that the judge. Or he said, you know, I would have imposed a sentence anyway under the fair sentencing. I would have given him the same sentence. Why doesn't that cure the initial problem? Well, because that's not what the district court said. He did not say I would have imposed the same sentence if the FSA applied, and because we can't be inside of his head, we don't know what he was thinking. We only know what words came out, and the words that came out were not those. Don't we know it from context? Don't we know that immediately before he speaks, the assistant U.S. attorney says, well, you know, out of something to the effect of out of an abundance of caution, if you're going to give this sentence, you ought to say you'd give the sentence the same way anyway. Under the fair sentencing act? And then there's an attempt to do that. And as you noted, the message might have gotten slightly garbled, but is it apparent that that's what the judge was trying to do? Well, the government's suggestion that he say the magic words, let's call them, and then his not saying them, there's a disconnect there that when the government bears the burden of proving harmlessness that we just can't fill in to say that this error was not harmless. I think that that's the best I can offer you on that, and I believe it's correct. Thank you. Ms. Haywood, do you want to respond on the Timmons issue? I thought you were calling me back again. Oh, no, no, no. Can I look that stupid? I just have a few comments. This court, under the Fourth Amendment, the question is whether the strip search was reasonable. That's the question. There is no less intrusive alternative means test, and this court, in fact, in Florence v. Roosevelt of Chosen Freeholders, specifically recognized that under the Fourth Amendment, the question is whether this search was reasonable. And it's our position that not only, this isn't a case where there was a Terry stop based on a tip from a couple years ago. There were multiple events on the night of October 13th, I believe, 2007, that would lead, that would support the strip search in this case. You had the comment from the CI, which you also had. What on the record would support the inevitable discovery? Anything about the intake procedures? Your Honor, that's why I didn't focus my argument on that in the brief. There really wasn't any information about the process. But as you said, you can take judicial notice that in light of where these drugs were found on this defendant, that in any jail, these drugs would have been discovered as part of a routine intake process. The testimony is what it is. The drugs were strapped between his penis and his testicles, and there were quite a lot of drugs there. So it's the government's position that, yes, inevitable discovery would apply. But I cannot point you to a place on the record where there was a detailed description of the intake procedures at the Indiana County Jail where he would have been going. But again, it's our position that we don't even need to get there because in light of the factors, the $845, the two cell phones, this wasn't a case where he was just coming out of a store or anything. He was at a college campus at 10 o'clock at night walking down the street with indicia of drug dealing and being arrested on three valid – I can't imagine how he was walking down the street, but apparently he wasn't walking down the street. Well, he was walking down the street with three felony outstanding drug warrants, and those are not being challenged. They were valid warrants for his arrest. So it's our position that – Can you really argue harmless error on the FSA point when the words that the he's going to give him the sentence in light of the mandatory minimum? Your Honor, yes, we can. As you noted, context is key here. You have to consider all of the statements of the court at the sentencing proceeding. There was a communication between the AUSA and the district court in which the AUSA mentioned that the statutory minimum under the – before the pre-FSA was within the guideline range of 51 to 63 months. There was entire conversation about that, and then the judge went on to say that – and I would give the sentence of 60 months' imprisonment whether or not the statute was retroactive. I mean, he did – In light of the mandatory minimum. You can't leave that out. That's what he says. He says, in light of the mandatory minimum. He did say that. So since – on this, would you agree that the harmless error standard here is the traditional one, that it burdens on you, and you have to make it clear that it didn't – the error didn't affect the sentence? Yes, I would. In the Langford decision, this court made clear that it's the government's burden to make this clear. But, again, you have to look at the context. But there's no harm to the government. If it does go back, if that's what he meant, he'll say it. If he would have given him a break under the FSA, he'll do that. It was the argument that we're making, that just to avoid an unnecessary procedure, especially in a case where Mr. Clemens, again – No, but if we're dealing with someone's liberty, the unnecessary procedure doesn't seem like such a big deal. No, Your Honor, but Mr. Clemens' sentence is almost up. And, again, to assume he would have gotten the 51 months is also an assumption. The judge did say, I would have given the sentence of 60 months, whether the statute was retroactive. So you have to consider that. But that was on request of the government attorney. In other words, isn't that the statement that the U.S. attorney made and the judge said, yes, yes, I would have given him 60 months anyway? That's correct, Your Honor. But the judge then did go do a very thorough 3553A analysis, demonstrating that this 60-month sentence was reasonable. It wasn't like there was no further analysis of Mr. Clemens' record. The judge did go through and make a very thorough examination. Is there anything to suggest that he took into account the Fair Sentencing Act before he imposed the sentence in the first instance? No, Your Honor. This judge made clear he felt that the Fair Sentencing Act did not apply, contrary to this Court's precedent in Dixon. What if he thought it did? I mean, is there any way we would know that he might have taken that into account and imposed a fairer sentence? Well, all we can do is look at the Court's statement. I shouldn't say fair. I should say different sentence. A different sentence. And in this case, the judge said, I would have given him the same sentence. And again, I can't dispute that he also went on to say, in light of the mandatory minimum. Thank you. Thank you. Ms. Benson, I think now you're doing Clemens' merits. Cunningham. Cunningham merits.